MILLERS MUTUAL FIRE INSURANCE COMPANY OF TEXAS, Appellant,

v.

FARMERS ELEVATOR MUTUAL IN-SURANCE COMPANY et al., Appellees.

No. 25863.

United States Court of Appeals
Fifth Circuit.

March 11, 1969.

David M. Kendall, Jr., Julian F. Foster, Dallas, Tex., for appellant; Woodruff, Hill, Kendall & Smith, Dallas, Tex., of counsel.

J. Edward Barth, Oklahoma City, Okl., for Farmers Elevator Mut. Ins. Co.; Barefoot, Moler, Bohanon & Barth, Okla-

homa City, Okl., Major C. Ginsberg, Dallas, Tex., of counsel.

Edwin L. Weisl, Jr., Asst. Atty. Gen., Alan S. Rosenthal, Robert E. Kopp, Attys., Dept. of Justice, Washington, D. C., for the United States as amicus curiae.

Before TUTTLE and GEWIN, Circuit Judges, and PITTMAN, District Judge.

PITTMAN, District Judge:

This is an appeal by the defendant Millers Mutual Fire Insurance Company (Millers) from a decision of the U. S. District Court for the Northern District of Texas, holding Millers liable to plaintiff Farmers Elevator Mutual Insurance Company (Farmers) for the amount paid by Farmers to the Commodity Credit Corporation (CCC), an agency of the United States, under an insurance policy. The district court took the case from the jury and granted plaintiff Farmers' motion for a directed verdict holding that Farmers became subrogated as a sub-surety to the rights of CCC and was entitled to complete recovery from Millers. Farmers Elevator Mutual Insurance Company v. Stanford, et al., 280 F.Supp. 523 (1967).

In 1960, CCC entered into a Uniform Grain Storage Agreement (U.G.S.A.) with Pat Stanford, doing business as Bardwell Grain Company, a licensed warehouseman. Under the agreement the CCC would deposit grain with Bardwell and receive warehouse receipts in return. The warehouseman was obligated to deliver to the CCC, in return for the receipts, grain of the same quantity and quality as that indicated in the receipts. The U.G.S.A. expressly provided that the "warehouseman shall be liable as an insurer" and was obligated to indemnify CCC for any loss. Pursuant to this obligation Bardwell obtained from defendant Millers in 1962 a surety bond, subsequently increased to $185,000. This bond bound Millers as surety "unto Commodity Credit Corporation and to any agency or person who may be injured by a breach. * * *" of the U.G.S.A. To meet the requirements of

Texas law, Article 5577a, Sec. 3, Vernon's Ann.Tex.Rev. Civil Statutes, Bardwell obtained additional bonds from Milllers effective during the period of June 1, 1963, to May 31, 1964, securing the faithful performance of its duties as public warehouseman. These bonds bound Millers as surety to the State of Texas and all persons doing business with the warehouseman.

In 1963, the CCC determined that it needed greater bond coverage than that provided by the standard warehouseman's bonds. On June 17, 1963, CCC obtained a "blanket insurance policy" from plaintiff Farmers. It provided Farmers would pay CCC all amounts "which CCC shall be entitled to recover from any warehouseman because of any failure of the warehouseman to perform fully its obligations under the Uniform Grain Storage Agreement." Paragraph 10 of the policy provides:

"In the event of any payment under this policy the *insurer shall,* to the full extent permitted by law, *be subrogated* to all of CCC's rights of recovery therefor against the *warehouseman and* any *other* person or *legal entity* to the extent of such payment." (Emphasis added.)

On July 1, 1963, the CCC and Bardwell entered into a modification of the U.G.S.A. as follows:

"The acquiring of a blanket insurance policy or blanket bond by CCC shall not relieve the warehouseman of any of his obligations under the UGSA nor shall any such insurance policy or bond inure to the benefit of the warehouseman. *If* the insurance company or surety company providing blanket coverage to CCC *pays* any amounts *to CCC* for which the warehouseman is liable *such company shall,* to the extent permitted by law, *be subrogated to CCC's right* of recovery *against* the warehouseman and *any other* person to the extent of such payment." (Emphasis added.)

On July 23, 1963, a date on which all the bonds and insurance policies were in

effect, CCC issued loading orders to Bardwell for delivery of grain on warehouse receipts belonging to CCC. Bardwell failed to deliver to CCC the grain stored by CCC in the required quantity and quality. CCC requested both Bardwell and Millers to reimburse it for the loss. When they refused, CCC filed a claim against Farmers under the blanket policy and Farmers paid CCC on September 25, 1964, approximately $23,000.00, and on September 29, 1964, paid $1,412.-08 in interest. Under the subrogation clause in the blanket policy and the Bond Amendment to the U.G.S.A., Farmers, after demand and refusal, filed this action against Millers. The other findings of fact of the district court are adopted by this court.

The district court held that Farmers was entitled to recovery under all of the bonds against Millers, and Farmers was subrogated to CCC's rights against Bardwell and Millers under the blanket policy and the U.G.S.A. amendment. The court rejected Millers' contention that it and Farmers were co-sureties and should share the loss. We agree with the district court.

## I.

■■ The first issue raised by Millers revolves around the subrogation clauses and their effect. Millers contends that subrogation is an equitable doctrine and may not be created by a contract. It is clear there are two kinds of subrogation: (1) legal or equitable, and (2) conventional. The first arises by operation of law and the second by contract or agreement. See especially Commercial Standard Ins. Co. v. American Employers Ins. Co., 209 F.2d 60 (6th Cir. 1954).

■ Whether or not subrogation was contracted for depends on the intent of the parties. There are several factors which show the intent of Farmers and CCC was that Farmers would promptly pay any loss sustained by CCC in return for the right of subrogation of CCC's rights against Bardwell and its surety.

The plain language of the blanket policy quoted above indicates Farmers' intent to contract for the right of subrogation.

In Southwestern Indemnity Co. v. National Surety Corp., 277 F.2d 545 (5th Cir. 1960) an almost identical clause was construed to allow the insurer to be subrogated to the insured's rights against another liability insurer. The Bond Amendment again used virtually the same language as used in *Southwestern* case, *supra*. Millers contends the words in the present subrogation clause " * * * to the full extent permitted by the law * * *." means the parties contracted only for equitable subrogation. This is not persuasive. Equitable subrogation need not be contracted for. Conventional subrogation was contracted for here and is exactly what the parties bargained for.

The lack of assent by Millers to the Farmers policy is immaterial. Millers expressly waived notice of modification of the warehouse agreement in its policies with Bardwell. Furthermore, on the question of Farmers' and CCC's intent, it is a fact that Farmers insured a risk almost eight times as great as Millers for a premium which was less than 1/5 of the premium Millers had received. The logical inference to be drawn from this is that Farmers expected to look to Millers for total reimbursement under the subrogation clause. This subrogation right substantially reduced the risk Farmers would otherwise bear. The district court in its decree noted that this court in Yonack v. Interstate Securities Co. of Texas, 217 F.2d 649, 651 (5th Cir. 1955), stated:

"The courts of Texas have been peculiarly hospitable to the right of subrogation and have been in the forefront in upholding the right to it. In Faires v. Cockerell, 88 Tex. 428, 31 S.W. 190, 194, 639, 28 L.R.A. 528, Judge Brown declared: 'Perhaps the courts of no state have gone further in applying the doctrine of subrogation than has the court of this state.' and later decisions have followed this lead."

Since the district court's decree, the 10th Circuit has rendered a decree directly in point, Jorski Mill & Elevator Co., Inc. v. Farmers Elevator Mutual Insurance Co., 10th Cir. 1968, 404 F.2d 143. The parties in the *Jorski* case and the case at bar are the same with the exception of the warehouseman, and the facts are substantially the same in both cases. The 10th Circuit held that Farmers was entitled to subrogation of CCC's rights against Millers for the entire amount paid.

The *Jorski* case, *supra,* and the district court's decree in this case sufficiently discuss the cases of cosurety and contribution, and sub-surety, which we approve, thereby holding Farmers is a sub-surety and not liable to Millers for contribution.

## II.

■ Millers also contends the losses occurred before the effective dates of the policies and bonds and thereby were not covered, but asserts its payment was that of a volunteer. As a volunteer, Farmers could not be subrogated to CCC's rights.

The basis for Millers' contention lies in its claim that CCC knew of the shortages prior to the effective dates of the policies as a result of periodic inspections by warehouse examiners. The record reflects various examinations revealed under-measurements (as well as over-measurements) on occasion. The last reported under-measurement prior to the effective dates of the policies was on February 26, 1963. The warehouseman made the proper adjustment. The warehouse examiner testified that as of July 1, 1963, (the effective date of the policies —the bonds were already in effect) his records indicated the warehouseman had sufficient grain to meet his obligations. In any event, the district court correctly held the obligation was breached upon the failure to load out the grain, and the key point in time is the date of refusal, citing and quoting from Hartford Accident & Indemnity Co. v. State of Kan., 247 F.2d 315 (10th Cir. 1957), which we approve.

## III.

The district court properly determined there were no questions of fact but only the legal effects of the facts were at issue.

The judgment rendered by the district court for plaintiff against defendant for the sum of $22,964.24 with interest thereon at the rate of 6% per annum from the 6th day of December 1963 until paid, and for all costs of the suit, is affirmed.